**Tetyana ANTOSHCHENKO, Petitioner,**

**v.**

**Alberto R. GONZALES, Attorney General, Respondent.**

No. 04–70214.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 18, 2006.

Filed Dec. 7, 2006.

James L. Rosenberg, Esq., Law Offices of James L. Rosenberg, Los Angeles, CA, for Petitioner.

CAC–District Counsel, Esq., Office of the District Counsel, Department of Homeland Security, Los Angeles, CA, Ronald E. LeFevre, Chief Counsel, Office of the District Counsel, Department of Homeland Security, San Francisco, CA, Gavin A. Corn, U.S. Department of Justice, Russell J.E. Verby, Esq., U.S. Department of Justice, Civil Div./Office of Immigration Lit., Washington, DC, for Respondent.

Before: GIBSON *, FISHER and CALLAHAN, Circuit Judges.

MEMORANDUM **

Tetyana Antoshchenko, a Ukrainian national, petitions for review of a Board of Immigration (BIA) decision that denied asylum, withholding of removal and relief under the United Nations Convention Against Torture (CAT). We have jurisdiction under 8 U.S.C. § 1252(b) and review the BIA's denial for substantial evidence. Where, as here, the BIA affirms without opinion, we directly review the Immigration Judge's (IJ) decision. *See Al–Harbi v. INS*, 242 F.3d 882, 887 (9th Cir.2001). We hold that the IJ's decision that Antoshchenko failed to establish past persecution is unsupported by substantial evidence. Accordingly we grant Antoshchenko's petition in part and remand for further proceedings. Because the parties are familiar

* The Honorable John R. Gibson, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36–3.

with the facts we do not recite them in detail.

## I. Waiver

The government argues that Antoshchenko waived all her claims by not raising them specifically and distinctly in her brief to this court. *See Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir.1994). The government is correct that Antoshchenko does not argue that she has a well-founded fear of future persecution (other than on the basis of the statutory presumption, *see* 8 C.F.R. § 208.13(b)(1)) or that she is entitled to withholding of removal or relief under the CAT. Accordingly, these claims are waived.

■ However, Antoshchenko does contend that she was subjected to past persecution because of her Jewish faith, and that this past persecution triggers the statutory presumption that she has a well-founded fear of future persecution. These claims are relatively underdeveloped but sufficient to avoid waiver. *See Independent Towers of Washington v. Washington*, 350 F.3d 925, 929 n. 2 (9th Cir.2003) (agreeing to consider appellant's challenges to five statutory provisions even though appellant "offered minimal argument on these sections" and provided only "truncated analysis").

## II. Past persecution

■ The IJ explicitly found Antoshchenko to be a credible witness but nevertheless ruled that the religious discrimination she experienced in the Ukraine did not rise to the level of past persecution. The IJ's finding on this issue is not supported by substantial evidence.

Antoshchenko testified that she has suffered discrimination and harassment because of her Jewish faith for her entire life. Focusing on the more recent events, she testified that she was twice detained by the police on account of her religion, in May and November 1999. The first detention took place after Antoshchenko participated in a rally advocating better treatment for the Ukraine's Jews. During the five-hour detention, police officers pushed her "horribly" so that she hit her head and called her an anti-Semitic epithet. According to the local ministry of home affairs, there was a "lack of … evidence" that Antoshchenko committed any crimes at the rally and thus "no criminal record was established against her." Despite the absence of criminal activity Antoshchenko was "strictly warned to take measures to prevent this kind of events from future occurrence."

The second detention occurred four months later when a police car approached a group of Jews (that included Antoshchenko) leaving a synagogue after attending a service for a Jewish holiday. The police officers demanded Antoshchenko's identification papers and took her to the police station when she asked why the papers were being requested. During this detention, the officers pushed and threatened Antoshchenko with clubs, pressured her to sign a statement that her synagogue's rabbi had agitated against the Ukraine's president, held her until 4 AM and told her that she would "regret" her actions and that she would "never get out of here." As soon as she was released two men beat and robbed her very close to the police station, but the police refused to investigate the incident, telling Antoshchenko to "[b]e happy that [she] stayed alive."

Shortly after the second detention, "strange things" began to happen to Antoshchenko. Her mail was "constantly" stolen and once set on fire, she received threatening anti-Semitic phone calls "two or three times a day" and the words "Kike" and "Be careful Kike" were repeatedly written on her property. In April 2000, Antoshchenko went to visit her

dying mother in another part of the Ukraine. Upon her return she discovered that her house had been robbed and burned. No criminal investigation into the robbery or fire ever took place.[1]

These facts compel us to hold that Antoshchenko was subjected to past persecution on account of her religion. Antoshchenko's experiences closely resemble those of the petitioners in *Korablina v. INS*, 158 F.3d 1038 (9th Cir.1998), *Smolniakova v. Gonzales*, 422 F.3d 1037 (9th Cir.2005), and *Krotova v. Gonzales*, 416 F.3d 1080 (9th Cir.2005), all Russian or Ukrainian Jewish women who were held by this court to have undergone past persecution. Like those women Antoshchenko was subjected to economic discrimination, persistent harassment and physical violence. It is true that Korablina and Smolniakova were more badly harmed than Antoshchenko, but Antoshchenko's injuries at the hands of the police and the assailants outside the police station are comparable to the large bruise and broken lip suffered by Krotova.[2] In addition, the burning of Antoshchenko's home—which circumstantial evidence such as the concomitant robbery and the earlier burning of her mail strongly suggests was arson rather than accident—was a serious non-physical injury that none of the petitioners in *Korablina*, *Smolniakova*, or *Krotova* had to endure.

The government's argument that Antoshchenko's experiences were more similar to those of the petitioner in *Nagoulko v. INS*, 333 F.3d 1012 (9th Cir.2003) (af-firming BIA denial of Ukrainian Pentecostal Chrisian woman's eligibility for asylum), is unpersuasive. While both Antoshchenko and Nagoulko were the targets of harassment and discrimination, Nagoulko was never detained by the police or beaten by thugs, nor did she receive threatening phone calls or have hostile graffiti scrawled on her property. Moreover, Antoshchenko suffered from having her mail stolen and burned and her home burgled and burned—under circumstances corroborating her belief she was being victimized as a Jew, even though the culprits went unidentified. Thus Antoshchenko's factual circumstances are more severe than Nagoulko's.

The IJ's findings that Antoshchenko was arrested because she violated local laws, that her mugging outside the police station was a random criminal act and that the burning of her home was an accident are speculative and hence not entitled to deference. *See Shah v. INS*, 220 F.3d 1062, 1069 (9th Cir.2000) ("[W]e have repeatedly held that it is error to rest a decision denying asylum on speculation and conjecture."). The IJ explicitly found Antoshchenko to be credible, so her testimony about the arrests, mugging, and fire (even if not the inferences she draws from those events) must be considered to be true. *See Kalubi v. Ashcroft*, 364 F.3d 1134, 1137 (9th Cir.2004).

Significantly, the IJ neglected crucial evidence in the record in making her factual findings. She concluded that Antoshchenko was arrested in May 1999 "because she

---

**1.** The dissent asserts that "[t]he primary basis for the majority's conclusion that Antoshchenko was persecuted is four incidents, consisting of two arrests, a robbery and a fire at her apartment." Dissent at 1. This is incorrect. Our conclusion is also based on the theft and burning of Antoshchenko's mail, the anti-Semitic graffiti scrawled on her property and the threatening phone calls she received. Moreover, Antoshchenko was beaten in addi-tion to being robbed outside the police station, and the fire at her apartment was accompanied by a burglary.

**2.** The dissent's quotation from *Krotova* is not to the contrary. *See* Dissent at 5. Krotova was entirely unharmed in one of the three incidents and incurred her minor injuries in the other two incidents. *Krotova*, 416 F.3d at 1082–83.

was violating local laws of disturbing the peace" but did not address the home ministry letter stating that there was no criminal evidence against her. The IJ also found that the November 1999 detention was not on account of Antoshchenko's religion without responding to the facts that the arrest occurred as she was leaving a synagogue and that she was pressured at the police station to sign a false letter incriminating her rabbi. Similarly, the IJ never discussed the strong circumstantial evidence suggesting that the mugging and burning of Antoshchenko's home were religiously motivated—namely, that the mugging occurred directly outside the police station where Antoshchenko had just been warned that she would "regret" her refusal to sign the incriminating letter, and that the fire was accompanied by the robbing of Antoshchenko's home and preceded by the burning of her mail. Given these omissions we cannot defer to the IJ's speculative findings and instead find ourselves compelled to conclude that Antoshchenko was indeed subjected to past persecution on account of her Jewish faith.[3]

### III. Well-founded fear of future persecution

The IJ also ruled that Antoshchenko failed to establish a well-founded fear of future persecution. We need not address this ruling (nor may we since Antoshchenko has waived her argument on this point) because of the statutory presumption that an asylum applicant who has established past persecution also has a well-founded fear of future persecution. 8 C.F.R.

§ 208.13(b)(1). This presumption may be rebutted if the government demonstrates by a preponderance of the evidence that circumstances in the Ukraine have fundamentally changed so that Antoshchenko no longer has a well-founded fear or that Antoshchenko could avoid future persecution by relocating to another part of the Ukraine. 8 C.F.R. § 1208.13(b)(1)(i).

The IJ did not reach the fundamental change in circumstances or relocation questions. We therefore remand to the BIA under *INS v. Ventura*, 537 U.S. 12, 17, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam), so that the government may attempt to rebut the statutory presumption that Antoshchenko has a well-founded fear of future persecution because of her past persecution. We also remand so that the Attorney General may exercise his discretion regarding whether Antoshchenko's application for asylum should be granted. *See* 8 U.S.C. § 1158(b); *Baballah v. Ashcroft*, 367 F.3d 1067, 1079 (9th Cir.2004).

The petition for review is **GRANTED in part; REMANDED for further proceedings.**

---

CALLAHAN, Circuit Judge, dissenting.

Although I appreciate the hardship Tetyana Antoshchenko has suffered, we must deny the petition for review of a denial of asylum unless the record compels a result contrary to that reached by the Immigration Judge ("IJ"). *Krotova v. Gonzales*, 416 F.3d 1080, 1084 (9th Cir.2005). Antoshchenko herself provided the evidence supporting the IJ's determination that Antoshchenko has not demonstrated past per-

---

**3.** The dissent defends all of the IJ's conclusions as reasonable. However, contrary to the dissent, Antoshchenko did not testify that she may have participated in an illegal protest prior to her first arrest; she said that she was not aware of the protest's legal status when she took part in it. Similarly, there is no evidence in the record that Ukrainians are required to carry their internal passports at all times, and Antoshchenko in fact testified that people generally do *not* always carry their passports. Furthermore, the dissent, like the IJ's opinion, never addresses the powerful evidence that the police were motivated by anti-Semitism when they detained Antoshchenko, namely their calling her an anti-Semitic slur and their efforts to coerce her into signing a statement incriminating her rabbi.

secution based on her religion. Because the evidence does not compel a conclusion that the IJ was wrong, I respectfully dissent.

Antoshchenko may well have experienced discrimination in her life, something I do not condone, but discrimination alone does not normally rise to the level of persecution. *See Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir.1995) (explaining that "[d]iscrimination on the basis of race or religion, as morally reprehensible as it may be, does not ordinarily amount to 'persecution' within the meaning of the Act").

The primary basis for the majority's conclusion that Antoshchenko was persecuted is four incidents, consisting of two arrests, a robbery and a fire at her apartment. The two arrests are the most serious allegations, but based on Antoshchenko's own admissions on cross-examination the IJ concluded that these were investigatory arrests of suspected illegal activity. Antoshchenko acknowledged with respect to the first arrest that she may have been engaged in an illegal protest. She acknowledged that the second arrest resulted when police demanded to see her internal passport, which she was apparently required to carry, but did not have with her. The majority comments that she was not charged with any crime, but I would note that in our country the police arrest persons on occasion for suspicion of criminal activity and then release them without charge or with a warning. Thus, the IJ's conclusion that both arrests were for suspicion of the violation of a "law of general applicability" was reasonable and supported by Antoshchenko's testimony.

The majority also cites the fact that the second arrest occurred as Antoshchenko and other Jews were leaving the synagogue. Yet Antoshchenko testified that the synagogue was "literally 30 to 35 meters" from the police station. Accordingly, the fact that police were in the vicinity of the synagogue and checking identity papers does not compel a conclusion that the police were acting with any improper motive to harass Antoshchenko.

The IJ's conclusion that Antoshchenko failed to show that the robbery and fire were related to her religion is also reasonable. The IJ concluded that the robbery was most likely "a random criminal act." [4] Although the majority describes the robbery as occurring "as soon as" she was released and "very close to police station" the evidence on this point is unclear. The IJ described the event as occurring "shortly after leaving the station." Antoshchenko testified that when she returned to the police station to report the crime the police officer who had interrogated her said: "[A]m I a dog to chase something through the rain to get something that belongs to you[?] Be happy that you stayed alive altogether." These facts do not compel a conclusion that Antoshchenko was targeted or that police refused to investigate because she was Jewish.

With respect to the fire in her apartment, Antoshchenko admits that there is at most circumstantial evidence that it was arson, much less that it was religiously motivated arson. The record indicates that a "preliminary investigation was conducted," but authorities concluded that the fire was a normal everyday occurrence and they did not have money for further investigation. There was no "criminal investigation" of the fire apparently because the authorities concluded it was an accident.

In light of all of the evidence, I disagree with the majority's characterization of the

---

4. The IJ noted that Antoshchenko testified that her assailants "told her nothing but to stop screaming." This is in stark contrast to cases such as *Smolniakova v. Gonzales*, 422 F.3d 1037, 1049 (9th Cir.2005), in which "Smolniakova's assailants called her a 'Jewish Bitch' " thus establishing a nexus between the beating and her religion.

IJ's findings as "speculative and hence not entitled to deference" (citing *Shah v. INS*, 220 F.3d 1062, 1069 (9th Cir.2000)). Antoshchenko had the burden of proving past persecution based on her religion. *Ladha v. INS*, 215 F.3d 889, 897 (9th Cir.2000). The IJ reasonably concluded that Antoshchenko had simply failed to present facts establishing a sufficient nexus between the events and anti-Semitism.

Moreover, the majority's reliance on *Shah* is misplaced. *Shah* explained that "[c]onjecture and speculation can never replace substantial evidence." *Shah*, 220 F.3d at 1069 (quoting *Maini v. INS*, 212 F.3d 1167, 1175 (9th Cir.2000)). In other words, the decision of the IJ must be based on substantial evidence and cannot be merely unsupported conjecture. *See also Lopez–Reyes v. INS*, 79 F.3d 908, 912 (9th Cir.1996) (holding that because the IJ did not set forth a specific reason for his conclusion but the conclusion was based on personal conjecture the conclusion therefore was not based on evidence). I agree that conjecture unsupported by evidence is not entitled to deference, but in the present case, the IJ's findings were supported by specific facts provided by Antoshchenko's testimony and are not mere conjecture.

Finally, the events described by Antoshchenko—being detained twice for several hours, being pushed by police when she was arrested, and being robbed and beaten by unknown assailants—are reprehensible but are nowhere near the level of seriousness found in the three asylum cases cited by the majority.[5] The majority concedes that in two of those cases the women "were more badly harmed than Antoshchenko" but suggests that Antoshchenko's injuries were "comparable to the large bruise and broken lip suffered by" petitioner in *Krotova*. Yet in *Krotova* the court explained that "Petitioner experi-

enced three violent assaults (one occurring at a synagogue and one involving her 9–year–old daughter), the murder of a close family friend, and the severe beating of her brother—all perpetrated by anti-Semitic groups." *Krotova*, 416 F.3d at 1084. Antoshchenko's mistreatment does not include either the gravity of injury or the clear racial animus present in the cases cited by the majority.

The evidence was probably sufficient to allow the IJ to find past persecution. However, our review is limited to determining whether the evidence compelled such a finding. I would deny the petition because Antoshchenko's testimony suggested that there were reasons other than anti-Semitism motivating the actions taken against her.

---

5. The majority cites *Korablina v. INS*, 158 F.3d 1038, 1041 (9th Cir.1998), in which the petitioner "was the subject of repeated beatings," *Smolniakova*, 422 F.3d at 1049–50, involving the brutal murder of two "close fami-

ly friends," plus an assault on Smolniakova followed by repeated death threats, and *Krotova v. Gonzales*, 416 F.3d 1080, 1084 (9th Cir.2005), involving three violent assaults.